UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ARAZ ALALI,

                                    Plaintiff,


            - against -


ALBERTO DeBARA, individually, KYLE WILSON,      **MEMORANDUM**
individually, EDWARD AUSTIN, individually,    **DECISION AND ORDER**
GEORGE MARSHALL, individually, HUMBERTO
MORRELL, individually, MATTHEW BRADY,      07 Civ. 2916 (CS)
individually, ROBERT GAZZOLA, individually,
PATRICK J. CARROLL, individually, and the CITY
OF NEW ROCHELLE, New York,

                                    Defendants.
--------------------------------------------------------------------x
ARAZ ALALI,

                                    Plaintiff,


            - against -                  07Civ. 9912 (CS)


CITY OF NEW ROCHELLE, New York,

                                    Defendant.
--------------------------------------------------------------------x
ARAZ ALALI,

                                    Plaintiff,


            - against -                  08 Civ. 4273 (CS)


CITY OF NEW ROCHELLE, New York,

                                    Defendant.
--------------------------------------------------------------------x


<u>Appearances</u>:

Jonathan Lovett, Esq.
Drita Nicaj, Esq.
Lovett & Bellantoni, LLP

Hawthorne, New York
*Counsel for Plaintiff*

Lalit K. Loomba, Esq.
Peter A. Meisels, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
White Plains, New York
*Counsel for Defendants*

Seibel, J.

The above-captioned actions are closely-related civil rights lawsuits brought by Plaintiff Araz Alali against the City of New Rochelle ("New Rochelle") and various members of the New Rochelle Police Department (collectively, "Defendants"). Before the Court are Defendants' consolidated motions for summary judgment in *Alali v. DeBara, et al.*, 07-cv-2916, ("*Alali II*"); *Alali v. City of New Rochelle*, 07-cv-9912, ("*Alali III*"); and *Alali v. City of New Rochelle*, 08-cv-4273, ("*Alali IV*"). (Doc. 55.[1])

## I.      BACKGROUND

Plaintiff was a police officer of Iraqi national origin hired by the New Rochelle Police Department ("NRPD") on February 10, 2002. (Defs.' 56.1 ¶¶ 1, 19.[2]) Plaintiff claims that he is the "only Police Officer of Middle Eastern descent who has ever been employed by the [NRPD]." (Pl.'s 56.1 p. 3 ¶ 16.[3]) Plaintiff has filed four related cases alleging unlawful discrimination, retaliation, and disparate treatment by New Rochelle and the individual defendants.

---

[1]  All references are to the *Alali II* docket, Case No. 07-cv-9912, unless otherwise noted.

[2]  "Defs.' 56.1" refers to Defendants' Consolidated Statement Pursuant to Rule 56.1, filed on August 14, 2009. (Doc. 56.)

[3]  "Pl.'s 56.1" refers to Plaintiff's Counter-Statement Pursuant to Local Rule 56.1 and Response to Defendants' Rule 56.1 Statement, filed on November 19, 2009. (Doc. 75.)

### A.   *Alali I*

The first related case, *Alali v. Gazzola et al.*, 07-cv-1296 ("*Alali I*"), was filed by Plaintiff on February 21, 2007.   Plaintiff alleged unlawful discrimination and retaliation by NRPD Captain Robert Gazzola, NRPD Commissioner Patrick Carroll, and New Rochelle because of Plaintiff's Iraqi national origin and because he filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") on February 12, 2007.  On June 25, 2007, the *Alali I* Defendants moved for summary judgment, and by memorandum and order on January 31, 2008, the Court (Brieant, J.) granted Defendants' motion and directed the Clerk to enter a final judgment dismissing all claims against the *Alali I* Defendants.  (Case No. 07-cv-1296, Doc. 19.)

### B.   *Alali II*

Approximately six weeks after bringing *Alali I*, Plaintiff filed the *Alali II* complaint on April 11, 2007, alleging unlawful retaliation for his filing of the EEOC and *Alali I* complaints by New Rochelle and the following individual defendants:  Lt. Alberto DeBara; Sgt. Kyle Wilson; Sgt. Edward Austin; Lt. George Marshall; Sgt. Humberto Morrell; Sgt. Matthew Brady; Deputy Commissioner Anthony Murphy; Gazzola; and Carroll.  (Defs.' 56.1 ¶¶ 28, 29.)  Three causes of action are alleged in the *Alali II* complaint:  (1) violation of Title VII, 42 U.S.C. § 2000e *et seq.*, against New Rochelle only; (2) violation of 42 U.S.C. §§ 1981 and 1983 against all Defendants; and (3) violation of Section 296 *et seq.* of the New York Executive Law ("Section 296") against all Defendants.

Defendants moved to dismiss the *Alali II* complaint on May 24, 2007.  (Doc. 17.)  The Court (Brieant, J.) denied the motion on July 19, 2007.  (Doc. 24.)  Defendants' Answer was filed on July 30, 2007, (Doc. 25), and Plaintiff was deposed on the defense of qualified immunity

on March 14, 2008, and April 4, 2008, (Defs.' Exs. 12, 13;[4] Pl.'s Exs. 30, 31[5]).  Pursuant to

Judge Brieant's rules, Defendants filed their first motion for summary judgment in *Alali II* on the

ground of qualified immunity on May 30, 3008, (Doc. 32); Plaintiff opposed and moved for

further discovery pursuant to Fed. R. Civ. P. 56(f) on October 3, 2008, (Doc. 49).  On September

17, 2008, this Court ordered the consolidation of *Alali II*, *Alali III*, and *Alali IV* for pretrial

purposes.  (Doc. 47.)  By decision and order dated October 24, 2008, this Court granted

Plaintiff's motion for further discovery and denied Defendants' motion for summary judgment in

*Alali II* without prejudice to renewal upon completion of discovery.  (Doc. 51.)  Additional

depositions of Plaintiff were taken and the individual defendants were deposed, and although the

parties disagree on whether all of Defendants' discovery demands were satisfied, (Defs.' 56.1 ¶

39; Pl.'s 56.1 p. 33 ¶ 39), all other discovery is concluded.  (Defs.' 56.1 ¶ 43.)

The instances of retaliation alleged in *Alali II* span the seven-week period from the filing

of the EEOC complaint on February 12, 2007, through Plaintiff's filing of the *Alali II* complaint

on April 11, 2007.  Plaintiff's counsel notified Carroll by facsimile that Plaintiff filed an EEOC

complaint on February 12, 2007.  (Pl.'s Ex. 14.)  Plaintiff alleges generally that all Defendants

became aware of the *Alali I* lawsuit shortly after it was filed.  (Pl.'s 56.1 p. 10 ¶ 52.)  He also

alleges that at roll call on February 21, 2007, in the presence of a number of Plaintiff's co-

workers, DeBara intentionally assigned Plaintiff to watch a hospitalized prisoner, a post normally

assigned to probationary and/or junior officers, despite the availability of at least four

probationary officers, and that DeBara advised Plaintiff that the reason he gave Plaintiff that

assignment was "because he could."  (*Id.* ¶ 53.)  Upon inquiring of Wilson the reason for the

---

[4]  "Defs.' Ex." refers to Defendants' Exhibits Submitted in Support of Motions for Summary Judgment.  (Doc. 57.)

[5]  "Pl.'s Ex." refers to Exhibits attached to Affirmation of Drita Nicaj in Opposition to Defendants' Motions for Summary Judgment.  (Doc. 74.)

hospital assignment, Plaintiff alleges that Wilson, in the presence of several civilian members of the NRPD, responded, "Get the fuck out of my face now Raz.  Not another fucking word, get out of my face."  (Pl.'s 56.1 p. 11 ¶ 54.)  Plaintiff also alleges that DeBara later informed Plaintiff that he would be assigned primarily to a "utility car" going forward, and if utility car services were not needed, Plaintiff would be assigned to directing traffic, watching suicidal prisoners, performing civilian dispatch work, and transporting prisoners to the County jail.  (*Id.* p. 11 ¶ 55.)

Plaintiff further contends that at roll call on March 7, 2007, again in the presence of several co-workers, DeBara assigned Plaintiff to a fixed foot patrol in the snow.  (*Id.* pp. 11–12 ¶ 56.)  In response to his inquiry why he was given that assignment, Plaintiff alleges that DeBara responded, "Because we can, we could put you anywhere Bin Laden."  (*Id.*)  Plaintiff also alleges that he asked Morrell, who was serving as "desk officer" on the same day, why he was assigned a foot patrol in the snow, and Morrell stated, "Because even though you are the most talented police officer you are not above scrutiny and I don't like you, ok, so hurry up and go outside.  It's really cold out—bundle up."  (*Id.* p. 12 ¶ 58.)  Plaintiff contends that on March 8, 2007, Austin and Morrell advised Plaintiff that he was routinely going to receive "undesirable assignments" because he was a "below standards officer," which Plaintiff argues was "a descriptive falsely given to Plaintiff by reason of his skin color, national origin and/or ethnicity." (*Id.* p. 12 ¶ 59.)  Plaintiff maintains that Morrell further advised Plaintiff, in Austin's presence, that Gazzola and Marshall had both directed Morrell and other supervisors to give Plaintiff "bad assignments" because of his "below standards" rating.  (*Id.*)

On March 21, 2007, Plaintiff alleges that he was informed in writing by Gazzola that Gazzola was rejecting Plaintiff's then-pending challenge to a job performance evaluation authored by Wilson in which Plaintiff maintains he was falsely characterized as "below

standards."  (*Id.* p. 12 ¶ 60.)  Plaintiff alleges that the next day, March 22, Gazzola issued

Plaintiff a "calculatedly false memorandum" describing Plaintiff as "below standards" and

advising Plaintiff that as a result of this status Plaintiff would be barred from overtime work,

special detail assignments, switching tours with other officers, and specialized unit assignments.

(*Id.* pp. 12–13 ¶ 61.)

       Plaintiff also contends that again in April 2007, Austin and Morrell advised Plaintiff that

he was to be given undesirable assignments and issued a below-standards evaluation at the

direction of Marshall and Gazzola.  (*Id.*)  On April 7, 2007, Austin allegedly assigned Plaintiff to

perform the civilian function of dispatching police vehicles from the Department's radio room,

and that Austin told Plaintiff, "It looks like you are going backwards to good old times."  (*Id.* p.

13 ¶ 62.)  In addition, Brady allegedly said to Plaintiff, "You better get a good lunch at 800

[hours] since you won't be able to leave the [radio] room, good luck."  (*Id.*)  One day later, on

April 8, 2007, Wilson allegedly assigned Plaintiff to work with civilian employees of the

Department, and after Plaintiff asked Wilson why Plaintiff was given this assignment, Wilson

told Plaintiff "You are an Arab and its [*sic*] Easter.  Camel jockeys don't celebrate Easter."  (*Id.*

p. 13 ¶ 63.)  Plaintiff contends that these assignments were the type normally given to

probationary officers.  (*Id.* p. 12 ¶¶ 62, 63.)

       Finally, Plaintiff contends that Murphy, with the agreement, approval, and/or

condonation of Gazzola and Carroll, intentionally withheld from Plaintiff college tuition

reimbursement funds to which he was entitled.  (*Id.* pp. 13–14 ¶ 64.)  Plaintiff maintains that he

timely submitted his tuition reimbursement request, yet received two thousand dollars less than

another officer who submitted nearly an identical request.  (*Id.* p. 14 ¶ 65.)  Plaintiff alleges that

Murphy agreed to reimburse Plaintiff only after receiving notice that Plaintiff had filed an EEOC complaint.  (*Id.* p. 14 ¶ 66.)

**C.**      ***Alali III***

Plaintiff filed the *Alali III* complaint on November 9, 2007, alleging one cause of action against New Rochelle for discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*  (Case No. 07-cv-9912, Doc. 1.)  Plaintiff alleges that subsequent to filing *Alali I* and *Alali II*, he was twice subjected to suspensions without pay in connection with the preferment of disciplinary charges that the "Commissioner of Police [had] repeatedly admitted were retaliatory and being prosecuted because of Plaintiff's filing" of *Alali I* and *Alali II*.  (Case No. 07-cv-9912, Doc. 1 ¶ 6(k); Pl.'s 56.1 p. 17 ¶ 77.)  Plaintiff further contends that he was permanently assigned to work as a *de facto* civilian in the role of dispatcher.  (Case No. 07-cv-9912, Doc. 1 ¶ 6(*l*); Pl.'s 56.1 p. 17 ¶ 78.)

**D.**      ***Alali IV***

The final case, *Alali IV*, was commenced on May 6, 2008.  (Case. No. 08-cv-4273, Doc. 1.)  Plaintiff alleges two causes of action against New Rochelle, claiming he was subject to disparate treatment on account of his national origin and in retaliation for having opposed discrimination in the workplace in violation of Title VII and Plaintiff's right to Equal Protection. (*Id.*) [6]  Plaintiff contends that although he was "identically situated" to several other police officers in the NRPD, he suffered disparate treatment by the imposition of two thirty-day suspensions without pay, which were motivated in whole or in substantial part because of his national origin, assertion of his rights under Title VII, opposition to race-based workplace discrimination, and/or "whistle-blowing" on department corruption.  In support, Plaintiff

---

[6]  In his Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Pl.'s Opp'n") Plaintiff withdraws a third claim for First Amendment chilling.  (Doc. 73 p. 37 n.5.)

describes various acts of misconduct that he alleges were committed by other NRPD officers and civilian employees and that resulted in either no disciplinary action or punishments less severe than his own.  (Pl.'s 56.1 pp. 19–24 ¶¶ 89–114.)

## II.    DISCUSSION

### A.    <u>Summary Judgment Standard</u>

Summary judgment is warranted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).  Accordingly, the trial court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "The burden then shifts to the non-moving party to demonstrate [by] specific facts . . . that there is a genuine issue for trial."  *Ward v. Rabideau*, No. 04-6488, 2010 WL 3063131, at *3 (W.D.N.Y. Aug. 2, 2010) (internal quotation marks omitted).  "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "Assessments of credibility and choices between

conflicting versions of the events are matters for the jury, not for the court on summary

judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff." *Anderson*, 477 U.S. at 252. To defeat summary judgment, the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and it "may not

rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express

Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

These standards apply in the Title VII context. *See Abdu-Brisson v. Delta Airlines*, *Inc.*,

239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be

appropriate even in the fact-intensive context of discrimination cases . . . the salutary purposes of

summary judgment—avoiding protracted, expensive and harassing trials—apply no less to

discrimination cases than to . . . other areas of litigation.") (internal quotation marks omitted).

### B. Discrimination and Retaliation

On a motion for summary judgment, the plaintiff must first make out a *prima facie* case

of discrimination or retaliation. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000);

*Clemente v. N.Y. State Div. of Parole*, 684 F. Supp. 2d 366, 374 (S.D.N.Y. Feb. 9, 2010). At the

*prima facie* stage, the burden of proof is *de minimis*. *Weinstock*, 224 F.3d at 42. If the plaintiff

meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. *Id.*

If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient

evidence for a reasonable juror to find that the reason offered by the defendant is "a mere pretext" for retaliation.  *Id.*[7]

To establish retaliation, Plaintiff must show that:  (1) he was engaged in an activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff based upon his protected activity; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by defendants.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted).  Finally, while "'individuals are not subject to liability under Title VII,'" *Sassaman v. Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009) (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)), a plaintiff seeking to hold an individual personally liable for retaliation under 42 U.S.C. §§ 1981 and 1983 must demonstrate that the defendant was "personally involved" in the retaliatory conduct at issue.  *Stevens v. New York*, 691 F. Supp. 2d 392, 401 (S.D.N.Y. 2009) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)).

As has been made clear in prior rulings in this case, (*see* Doc. 51 pp. 17–18), when a retaliatory action is alleged to be based on the filing of a prior discrimination complaint, the plaintiff must establish that each individual defendant against whom he brings the retaliation claim was personally aware of the prior complaint at the time he engaged in the alleged retaliatory conduct at issue.  *See Richards v. N.Y. City Police Dep't*, No. 97-179, 1999 WL

---

[7]  This framework applies to all Title VII, 42 U.S.C. §§ 1981 and 1983, and New York Executive Law § 296 claims.  *See*, *e.g.*, *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (burden shifting framework applies to both § 1981 and Title VII); *Weinstock*, 224 F.3d at 42 n.1 (identical standards apply to employment discrimination claims brought under Title VII and New York Executive Law § 296); *Thomas v. N.Y. City Health & Hosps. Corp.*, No. 02-5159, 2004 WL 1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004) ("While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.").

33288, at *10 (S.D.N.Y. Jan. 25, 1999) (plaintiff's "vague allegation" that it was "common knowledge" in police department that she made EEOC complaint insufficient to establish knowledge of prior charge on part of those allegedly retaliating against her). This Court was also explicit that "[u]nsubstantiated speculation that an individual with awareness of a prior complaint 'must have' informed a defendant of the prior complaint based merely on their relationship with one another is insufficient to establish awareness." (Doc. 51, p. 18 (citing *Montanile v. NBC*, 211 F. Supp. 2d 481, 488 (S.D.N.Y. 2002).)[8]

### C.   Qualified Immunity

A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; (2) where that conduct was prohibited, if the plaintiff's right to be free of such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the clearly established legal rules at that time. *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal citation marks and quotations omitted); *see Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken.") (internal citation marks omitted). Thus,

---

[8] In *Henry v. Wyeth Pharmaceuticals, Inc.*, No. 08-1477, 2010 WL 3023807, at **10–11 (2d Cir. Aug. 4, 2010), the Second Circuit reiterated that the employer's corporate knowledge of the protected activity sufficed to make out the knowledge element of a retaliation claim, and held that the causal connection element could be satisfied by showing that the actor who effectuated the adverse action either had personal knowledge of the protected activity or acted at the direction or encouragement of a superior with such knowledge. I read *Henry* (and *Gordon v. New York City Board of Education*, 232 F.3d 111, 116 (2d Cir. 2000), on which it relies, *see Henry*, 2010 WL 3023807, at *10) as discussing the requirements for corporate (employer) liability. I do not read them as permitting an individual to be liable for retaliation when the individual is unaware of the protected activity against which he is allegedly retaliating. Accordingly, the personal knowledge requirement for individual defendants is in my view alive and well.

qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341 (1986), and summary judgment should be granted on the basis of a qualified immunity defense where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law," *Husain v. Springer,* 494 F.3d 108, 131 (2d Cir. 2007).

Whether a government official is entitled to qualified immunity is a two-step inquiry. One, the Court "must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan,* 129 S. Ct. 808, 815–16 (2009) (citation omitted). Two, the Court "must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* at 816. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* The steps are not chronologically fixed, however, as the Supreme Court has held that the Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*; *see Seri v. Bochicchio*, No. 09-1266, 2010 WL 1193714, at *1 (2d Cir. Mar. 30, 2010).

### D.   Application

In support of their motions for summary judgment, Defendants raise several arguments.  I will discuss each motion in turn.

#### 1.   *Alali II*

##### a.   Commissioner Carroll

Plaintiff contends that after receiving notice of Plaintiff's protected activities, Carroll failed to protect Plaintiff from "discriminatory and retaliatory treatment," and "commencing in

November 2006 . . . participated in the retaliatory actions." (Pl.'s Opp'n 31.) The alleged

retaliatory actions to which Plaintiff is referring are unspecified. He further alleges that Carroll

"intentionally withheld from Plaintiff college tuition reimbursement funds to which he is

entitled." (*Id.* at 9.) Plaintiff maintains that Carroll advised Plaintiff that if he withdrew his

federal lawsuits, Carroll would withdraw disciplinary charges that were preferred against

Plaintiff, which Plaintiff argues demonstrates the "sham nature" of the disciplinary charges. (*Id.*)

Defendants argue that Carroll is entitled to summary judgment on the merits and on

grounds of qualified immunity because of the absence of evidence to support the claim that

Carroll was personally involved in the alleged retalitatory conduct at issue in *Alali II*. They

contend that there is no record evidence raising a fact issue as to Carroll's personal involvement

in any of the specific acts of retaliation, and he is therefore entitled to summary judgment.

(Defs.' *Alali II* Mem. 6.[9])

As noted, to hold an individual personally liable for retaliation under 42 U.S.C. §§ 1981

and 1983, a plaintiff must show that a defendant was "personally involved" in the retaliatory

conduct at issue. *Stevens*, 691 F. Supp. 2d at 392. Plaintiff alleges that Carroll "failed to take

any action to cease retaliatory conduct" after "Plaintiff repeatedly communicated" with Carroll

about such conduct, and identified two memoranda he wrote to Carroll complaining of

mistreatment by other officers. The first, dated February 16, 2007, contains the subject line

"Continual retaliation based on heritage" and describes a meeting Plaintiff had with DeBara, in

which DeBara praised Plaintiff but then allegedly told Plaintiff that he would be given

undesirable assignments per Gazzola's order, including "work[ing] utility and be[ing] sent all

over the city to handle the least desirable jobs." (Pl.'s Ex. 9.) Plaintiff's second memorandum to

---

[9] "Defs.' *Alali II* Mem." refers to Memorandum of Law in Support of Defendants' Renewed Motion for Summary
Judgment. (Doc. 62.)

Carroll, dated February 18, 2007, also contained the subject line "Continual retaliation based on heritage." (*Id.* Ex. 11.)  In it, Plaintiff describes being asked by Austin about the location of his hat, though no other officer was similarly queried; being asked by Austin to re-write a criminal mischief incident report; and Austin's refusal to allow an officer who was a Police Benevolent Association board member to be present in Austin's office while Plaintiff continued to protest the order to re-write his report.  (*Id.*)  Defendants argue that Plaintiff has failed to present any evidence showing that Carroll was personally involved in the alleged retaliatory conduct, deny Plaintiff's characterization of memoranda as evidence of retaliation, and object to the admissibility of the memoranda and their use to create a fact issue in the absence of an authenticating declaration.  (*See* Defs.' Resp. 56.1 ¶¶ 49, 50.[10]).

Defendants are correct that the memoranda, which lack authenticating affidavits, are inadmissible, *see Vigilant Ins. Co. v. M/T Clipper Legacy*, 656 F. Supp. 2d 352, 354 n.1 (S.D.N.Y. 2009) ("Generally, for a document to be admissible for purposes of a motion for summary judgment, it must be authenticated by, and attached to, an affidavit meeting the requirements of Federal Rule of Civil Procedure 56(e)."), and as such, "not competent evidence in opposition to summary judgment," *Patterson*, 375 F.3d at 222.[11]  No other evidence has been

---

[10] "Defs.' Resp. 56.1" refers to Defendants' Response to Plaintiff's Counter-Statement Pursuant to Local Rule 56.1. (Doc. 70.)

[11] Plaintiff simply attached the memoranda at issue to an affirmation of counsel, but did not submit an affidavit attesting to the authenticity of the memoranda, as required by Fed. R. Civ. P. 56(e)(1), or establish that they were even in fact given to Carroll.  *See Liani v. Baker*, No. 09-2652, 2010 WL 2653392, at *6 (E.D.N.Y. June 28, 2010) (exhibits attached to affidavit inadmissible because they were not certified copies, nor did affidavit explicitly state that attached documents were true and accurate copies of originals).  It seems that it would have been simple enough to do so, or to depose Carroll on the subject, were the facts as Plaintiff claims.

presented of communication with Carroll regarding any retaliatory conduct during the relevant

time period, and on this basis alone, summary judgment is warranted.[12]

Even if I were to consider the memoranda, Plaintiff has still failed to show that Carroll

was involved in any retaliatory conduct. The conduct described in the memoranda—even if it

could be described as conduct that "well might have dissuaded a reasonable worker from making

or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 68 (2006) (internal quotation marks omitted), as opposed to "those petty slights or minor

annoyances that often take place at work and that all employees experience," *id.*—was not

committed by Carroll himself or by others on his behest or direction. *See Henry*, 2010 WL

3023807, at **10–11. His alleged failure to do anything about it likewise does not constitute

retaliation. "[I]n a run-of-the-mine case such as this one . . . failure to investigate a complaint of

discrimination cannot be considered an adverse employment action taken in retaliation for the

filing of the same discrimination complaint . . . [unless] the failure is in retaliation for some

separate, protected act by the plaintiff." *Fincher*, 604 F.3d at 721–22. If, in a typical case such

as this one, ignoring a complaint of discrimination is not retaliation, it logically follows that

ignoring a complaint of retaliation is not retaliation either, at least absent more compelling

circumstances than are presented here. Thus the Second Circuit in *Fincher* distinguished *Rochon*

*v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006). While retaliation was shown in *Rochon*, where the

refusal to respond to an employee's complaint of a death threat was allegedly in retaliation for

his separate and earlier complaint of discrimination by the same employee, *see id.* at 1219–20, as

well as in other cases that "similarly involve employees who allegedly suffered harms resulting

---

[12] Defendants also argue that the memoranda are hearsay. While they cannot be considered for the truth of the matters asserted therein, they could (if authentic and given to Carroll) be considered for the fact that the statements were made to Carroll.

from, but separate from, the disposition of, their initial complaints of discrimination," the court in *Fincher* found that "a reasonable employee in Fincher's place had nothing to lose by bringing this complaint, or another one following it, because the result of bringing the complaint and not bringing the complaint under the conditions alleged was the same:  the complaint would not be investigated."  604 F.3d at 722.  This reasoning flows from the fact that anti-retaliation law protects against "retaliation that produces an injury or harm."  *Burlington*, 548 U.S. at 67.  Thus, here, whether or not Carroll looked into Plaintiff's complaints of retaliation by others, Plaintiff suffered no adverse action beyond the alleged retaliation by others.  Because Plaintiff has not shown personal involvement of Carroll, harm resulting from Carroll's inaction, or conduct on his part that could reasonably be considered injury-producing, summary judgment is merited.

As for the alleged withholding of tuition reimbursement, at most Plaintiff has shown that Carroll was generally aware that Plaintiff was taking college classes.  (*See* Pl.'s Ex. 57.)  There is no evidence in the record that Carroll was personally involved in the calculation and award of tuition reimbursement to Plaintiff.

Finally, Carroll's discussion with Plaintiff about resolving his pending lawsuits—in which he allegedly told Plaintiff that in exchange for dropping his federal lawsuits, Carroll would withdraw the disciplinary charges against Plaintiff, (Pl.'s Ex. 62 p. 63)—is inadmissible on the issue of liability, and Plaintiff has not suggested a non-prohibited use that would allow these statements' use under Federal Rule of Evidence 408(b).  *See* Fed. R. Evid. 408; *Hussein v. Hotel Emps. & Rest. Union, Local 6*, No. 98-9017, 2002 WL 10441, at *2 (S.D.N.Y. Jan. 3, 2002).

Because Plaintiff has failed to make out a violation of a constitutional right by Carroll, nor shown that Carroll's actions "were objectively unreasonable in light of clearly established

law," *Husain*, 494 F.3d at 131, Carroll is entitled to qualified immunity and summary judgment

on that basis.

b.     Deputy Commissioner Murphy

Plaintiff argues that Murphy is not entitled to qualified immunity for many of the same

reasons as Carroll.  He contends that Murphy had notice of Plaintiff's protected activities and

failed to do anything to protect Plaintiff from discriminatory and retaliatory treatment, including

when Plaintiff advised Murphy on March 8, 2007 that Gazzola was "singling [Plaintiff] out again

and again."  Plaintiff maintains that Murphy initially denied Plaintiff's tuition reimbursement

request, later authorized payment for "some but not all of what Plaintiff was entitled to receive,"

and caused Plaintiff's reimbursement to be "substantially less than other members of the

Department following Plaintiff filing *Alali I*."  (Pl.'s Opp'n 31–32.)

Defendants do not specifically address Plaintiff's March 8, 2007 memorandum to

Murphy in which Plaintiff states he wishes to "file a complaint against Captain Gazzola" for

"singling me out again and again," and in which Plaintiff claims that "it seems Captain Gazzola

is already rubber-stamping my evaluation 'below standards.'" (Pl.'s Ex. 12.)  Rather, Defendants

maintain that because the preferment of disciplinary charges against Plaintiff on February 15,

2007—which appear to form the basis for Plaintiff's complaints about Gazzola in the March 8,

2007 memorandum to Murphy—were previously alleged in *Alali I*, they are inactionable in *Alali*

*II* and relevant only as background material.  (Defs.' *Alali II* Mem. 7.)  That is, Defendants argue

that this Court's prior ruling on the first Motion for Summary Judgment, (Doc. 51), makes clear

that because the disciplinary charges were already disposed of in *Alali I*, they were not at issue in

*Alali II*, and that this decree extends to Plaintiff's March 8, 2007 memorandum to Murphy about

Gazzola.

Accordingly, Defendants contend that the only pertinent allegation against Murphy is the alleged withholding and unfair award of tuition reimbursement funds.  Defendants argue that the NRPD's tuition reimbursement program required participants to, among other things, submit their invoices for reimbursement on or before a certain deadline, which for courses ending in 2006 was January 19, 2007.  (Defs.' 56.1 ¶ 169.)  In support, Defendants submit an email sent to the entire NRPD by Murphy on December 29, 2006, giving this deadline for reimbursement applications.  (Defs.' Ex. 65.)  Timely invoices were submitted by thirteen officers, though not by Plaintiff.  (Defs.' 56.1 ¶ 170.)  Murphy then calculated the awards to be given from the total NRPD fund of $40,000.  (*Id.* ¶ 167.)  The awards included a universal award of $2,000 (or, if the reimbursement request was less than $2,000, the entire amount requested), plus an amount determined by dividing the balance left in the fund by the amount needed to fully fund all remaining applicants.  (*Id.* ¶ 176.)  The resulting percentage (approximately 66%) was then applied to the balance left for each officer who had sought reimbursement in excess of $2,000, and that amount was added to each officer's universal award of $2,000.  (*Id.* ¶¶ 177, 178; *see* Defs.' Ex. 66 (table containing 2006 tuition reimbursement amounts).)   After performing these calculations on or about January 24, 2007, Murphy advised the thirteen officers of the amounts they would be receiving and arranged for checks to be prepared.  (Defs.' 56.1 ¶ 180.)

Defendants argue that Plaintiff did not submit his tuition reimbursement request on or before the January 19, 2007 deadline, but rather submitted his request on February 5, 2007.  (*Id.* ¶ 181.)[13]  Notwithstanding the late submission, Murphy sought permission to secure funds for

---

[13]  Plaintiff points to no evidence (even in his deposition) controverting Defendants' claim that Plaintiff did not submit his application until February 5, 2007, which position is supported by an affidavit from Murphy's secretary and a copy of her handwritten note to Murphy, dated "2-5-07," stating that Plaintiff submitted the attached invoices "today."  (Defs.' Ex. 67.)  Nor does Plaintiff deny that he was not one of the thirteen officers who submitted their reimbursement requests to Murphy on or before the January 19, 2007 deadline.  (Pl.'s 56.1 p. 64 ¶ 170.)

Plaintiff's reimbursement on February 12, 2007, obtained permission on February 13, 2007, and calculated an award for Plaintiff as it would have been determined if Plaintiff had timely submitted his request.  (*Id.* ¶¶ 183–86.)  Addressing Plaintiff's allegation that he received less than other members in the NRPD, Defendants offer evidence that the approximately $2,000 difference between the award received by Plaintiff ($5,724) and Officer Wolf, whose tuition was approximately the same as Plaintiff's and who received $7,469 in tuition reimbursement, was because Officer Wolf's reimbursement was calculated when there were only thirteen participants, not fourteen, as applied when Murphy determined Plaintiff's reimbursement.[14]  (*Id.* ¶ 190.)  Had Plaintiff timely submitted his tuition reimbursement request and been included in the original group of officers among whom the total reimbursement fund was shared, Defendants contend that the difference between Plaintiff's and Officer Wolf's reimbursements would only be $47.  (*Id.*)

For Plaintiff to prevail on his retaliation claim against Murphy, Plaintiff must show that Murphy was aware that Plaintiff was engaged in a protected activity, that he took an adverse action against Plaintiff, and that there is a causal connection between the protected activity and the adverse action.  *Fincher*, 604 F.3d at 720.  It is not disputed that Plaintiff's February 21, 2007 filing of the *Alali I* complaint, in which Murphy was not named as a defendant, post-dated Plaintiff's request for tuition reimbursement and Murphy's request for funds to reimburse Plaintiff.  (*See* Pl.'s 56.1 p. 67 ¶ 183.)  While there is some dispute about whether Murphy emailed his request for funds to reimburse Plaintiff before Plaintiff's lawyer faxed Carroll a notice that an EEOC charge had been filed, (*compare* Defs.' 56.1 ¶ 184, *with* Pls.'s 56.1 pp. 67–68 ¶ 184), Plaintiff has not established, as he must to maintain a retaliation claim, that Murphy

---

[14]  It is not disputed that the actual amount sent to the college where Plaintiff was taking classes was $5,714, and the $10 difference was a clerical error.  (Defs.' 56.1 ¶ 188; Pl.'s 56.1 p. 69 ¶ 188.)

19

was "personally aware" of the EEOC charge at the time he sought permission to reimburse and calculated reimbursement for Plaintiff.  *See Richards*, 1999 WL 33288, at *10.  A fax addressed to Carroll does not establish Murphy's awareness, notwithstanding Plaintiff's conclusory claims in his deposition that Murphy knew about the fax and therefore the filing of the EEOC charge because Carroll and Murphy shared an office.  (Pl.'s Ex. 30 pp. 85–86.)

Even assuming that Plaintiff could show Murphy's awareness, no apparent adverse action resulted.  In the context of federal retaliation claims, Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68 (internal quotation marks omitted).  While "there are no bright-line rules with respect to what constitutes an adverse employment action for purposes of a retaliation claim," *Fincher*, 604 F.3d at 721 (internal quotation marks omitted), the adverse action must be "material" because "it is important to separate significant from trivial harms," and an "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington*, 548 U.S. at 68.

Here, Plaintiff does not specifically dispute that his tuition reimbursement request was submitted after the deadline had passed,[15] alleging only generally (without underlying evidentiary support, even in his own deposition) that he "timely submitted" his reimbursement request, (Pl.'s Opp'n 9; Pl.'s 56.1 p. 14 ¶ 65), and that Carroll and Murphy were aware that he was taking college classes, (Pl.'s 56.1 p. 67 ¶ 183).  Nor does Plaintiff deny that the college at which he was taking classes received a check in the amount of $5,714 from the NRPD and

---

[15]  See note 13 above.

applied it towards Plaintiff's tuition on March 27, 2007.  (*Id.* pp. 68–69 ¶¶ 188, 189.)  It is hard

to imagine how giving Plaintiff his reimbursement, even though he missed the deadline, can be

interpreted as adverse.

Finally, Plaintiff has not shown a "causal connection" between the filing of the EEOC

charge and/or the *Alali I* complaint and the belated tuition reimbursement, which appears to have

been occasioned solely by Plaintiff's own late submission of the reimbursement request.  The

EEOC charge was filed on February 12, 2007, and Murphy sought permission to reimburse

Plaintiff on the same day.  (Defs.' 56.1 ¶ 183.)  It is thus impossible to construe any delay in

reimbursement as retaliatory.  And while Plaintiff denies the "materiality" of Defendants'

explanation for the difference in reimbursement amounts between Plaintiff and Officer Wolf, the

materiality is clear:  it fully explains why Plaintiff got less than the only other officer with a

comparable tuition reimbursement request.  In any event, Plaintiff has not denied or provided

facts to dispute the substance of Defendants' explanation for the difference, which is not only

uncontradicted but seems completely plausible.  There is thus an absence of evidence that the

discrepancy was based on or caused by Plaintiff's protected speech.  Plaintiff has thus failed to

make out a claim for retaliation against Murphy based on the events concerning the

reimbursement of Plaintiff's tuition.  Indeed, if anything, Murphy appears to have gone out of his

way to get Plaintiff the payment despite Plaintiff's unexplained missing of the deadline.

As for Plaintiff's claim that Murphy did not act to protect Plaintiff from discriminatory

and retaliatory treatment from Gazzola, despite Plaintiff's March 8, 2007 memorandum to

Murphy in which he states that Gazzola was singling out Plaintiff based on Gazzola's review of

the "below standards" evaluation of Plaintiff,[16] it is not disputed that when the Court (Brieant, J.) in *Alali I* granted summary judgment for defendants, it found that the "below standards" job evaluations received by Plaintiff "were reasonable in light of the complaints and command discipline letters received." (Defs.' Ex. 7 p. 9.)  Given that the relevant "below standards" evaluation has been determined by the Court to be reasonable and justified in light of Plaintiff's disciplinary record, it can hardly be said that Murphy's inaction with respect to Gazzola's review of that evaluation was objectively unreasonable or violated a constitutional right. *See Amore v. Novarre*, No. 08-3150, 2010 WL 2490017, at **4–5 (2d Cir. June 22, 2010).

Because Plaintiff has not made out a retaliation claim, nor shown that Murphy's conduct with respect to any of the allegations against him violated a clearly established constitutional right, Murphy is entitled to qualified immunity and summary judgment on that basis.

## c.    Lieutenant DeBara

As discussed above, Plaintiff claims generally that after the filing of the *Alali I* complaint, all Defendants, including DeBara, were quickly aware of its filing.  He claims that DeBara, in front of Plaintiff's co-workers, gave Plaintiff punitive assignments normally given to less senior officers on February 21, 2007 (Plaintiff assigned to a fixed hospital post), and March 7, 2007 (Plaintiff assigned to a fixed foot patrol in the snow).  (Pl.'s 56.1 pp. 10–12 ¶¶ 53, 56.)  He also states that on both occasions DeBara made comments to him indicating the retaliatory intent of such assignments:  that on February 21, 2007, DeBara advised Plaintiff the reason he assigned Plaintiff a hospital post was "because he could," (*id.* pp. 10–11 ¶ 53), and on March 7, 2007, DeBara told Plaintiff the reason he was given a foot patrol was "because we can, we could put you anywhere bin Laden," (*id.* pp. 11–12 ¶ 56).  Finally, Plaintiff claims that after receiving the

---

[16]  Plaintiff has not established the authenticity of his memorandum to Murphy or that Murphy in fact received the memorandum.  See note 11 above.

hospital post assignment on February 21, 2007, DeBara told Plaintiff that going forward Plaintiff would be assigned primarily to a "utility car," or alternatively to directing traffic, watching suicidal prisoners, performing civilian dispatch work, and transporting prisoners to the County jail.  (*Id.* p. 11 ¶ 55.)  Plaintiff concludes that DeBara's claimed entitlement to qualified immunity is "specious."  (Pl.'s Opp'n 28.)

Defendants argue that DeBara took no adverse actions against Plaintiff and that he is entitled to qualified immunity and summary judgment on that basis.  They contend that the assignments given out on February 21, 2007, were not selected by DeBara himself, but rather by a desk officer who prepared the assignments in advance, ruling out any adverse intent by DeBara.  (Defs.' *Alali II* Mem. 14–15; Defs.' 56.1 ¶ 206.)  Defendants further contend that DeBara was not aware of the filing of the *Alali I* complaint until at least two hours after Plaintiff was assigned to the hospital post, (Defs.' 56.1 ¶¶ 212–13), and, in any event, that the hospital post assignment does not amount to an adverse employment action for purposes of a retaliation claim, (Defs.' *Alali II* Mem. 15; Defs.' Reply 10[17]).  Defendants similarly claim that the March 7, 2007 foot patrol assignment was actually assigned by the desk officer and does not constitute an adverse employment action.  (Defs.' *Alali II* Mem. 15; Defs.' Reply 10; Defs.' 56.1 ¶ 215.)  In addition, Defendants claim that Plaintiff was originally assigned to pick up prisoners that day as the first part of his daily duties, and that Plaintiff, after complaining about his assignment that day, went home sick about thirty minutes after receiving his assignment at roll call and did not start or complete his tour of duty on March 7.  (Defs.' 56.1 ¶¶ 216, 217, 218, 220.)  Finally, Defendants deny that DeBara used the phrase "bin Laden" when referring to Plaintiff, and that

---

[17]  "Defs.' Reply" refers to Reply Memorandum of Law in Further Support of Defendants' Motions for Summary Judgment.  (Doc. 72.)

the phrase "because we can" derived from a memorandum written by Plaintiff himself.  (Defs.'
*Alali II* Mem. 16; Defs.' 56.1 ¶ 221; Pl.'s Ex. 10.)

To start, Plaintiff bears the burden of establishing that DeBara was aware of the *Alali I*
complaint at the time he gave Plaintiff the allegedly adverse assignments.  *See Saqib v. Stein
deVisser & Mintz, PC*, No. 09-4624, 2010 WL 2382253, at *1 (2d Cir. June 15, 2010) (plaintiff
must show defendant's awareness of plaintiff's engagement in protected activity to make out
*prima facie* case of retaliation).  Though Plaintiff alleges that "all Defendants learned Plaintiff
had filed a lawsuit," he had not established that DeBara personally knew of the suit at the time he
assigned Plaintiff on February 21, 2007 to the hospital post.  Plaintiff does not deny or present
evidence contrary to Defendants' claim that DeBara only learned of the complaint when he
visited Plaintiff at the hospital (two hours after the assignment was made) and was informed by
Plaintiff himself, (*see* Defs.' 56.1 ¶ 212); indeed, Plaintiff corroborates the claim, (*see* Pl.'s 56.1
p. 10 ¶ 52a; Pl.'s Ex. 29, pp. 34, 41–42).[18]  Because it is clear that DeBara lacked the knowledge
of Plaintiff's protected activity that is required to sustain a retaliatory claim, he is entitled to
qualified immunity and summary judgment on that basis as to the February 21, 2007 hospital
post and related comment.

The March 7, 2007 foot patrol incident lacks any evidence that it was DeBara who gave
Plaintiff the allegedly adverse assignment.  Plaintiff did not dispute Defendants' claim that in
February 2007 DeBara, as tour commander, did not make specific assignments, but rather
distributed assignments that were prepared in advance by the desk officer.  (*See* Pl.'s 56.1 p. 72

---

[18]  Nor has Plaintiff shown that DeBara was carrying out an adverse action pursuant to encouragement of a superior
with knowledge of Plaintiff's protected activity, *see Henry*, 2010 WL 3023807, at *11, since there is no evidence in
the record that the hospital assignment was made at the direction of a supervisor.  Even if such evidence existed, it
could only be used to help establish New Rochelle's liability; it would not help in establishing DeBara's personal
liability.  See note 8 above.

24

¶¶ 205, 206.)  While he denies Defendants' identical claim with respect to March 7, 2007, (*id.* p. 73 ¶ 215), nothing in the evidence to which he points contradicts or undermines Defendants' evidence that it was the desk officer—and not DeBara—who drew up the assignments, and that DeBara merely handed them out at roll call.  (*See id.* pp. 10–11 ¶¶ 52a, 53, 56; *id.* p. 73 ¶ 215; Pl's Opp'n 28; Doc. 61 ¶ 4.)  Indeed, Plaintiff elsewhere admits that "specific tour assignments . . . are prepared in advance by the desk officer."  (Pl.'s 56.1 p. 72 ¶ 206.)

Regarding DeBara's alleged comments to Plaintiff that going forward Plaintiff would be assigned to a "utility car," or else directing traffic, watching suicidal prisoners, performing civilian dispatch work, or transporting prisoners, the parties disagree on whether DeBara made the comment.  (*Compare* Pl.'s Opp'n 7, 28, *with* Defs.' Resp. 56.1 ¶ 55.)  Assuming he did, Plaintiff has not provided any evidence that he was, in fact, given the utility car assignment during the relevant time period,[19] and, apart from the hospital post discussed above and the foot patrol discussed below, alleges only generally that he received undesirable assignments from DeBara.  (*See* Pl.'s Ex. 29, pp. 43–49.)  In his depositions, Plaintiff was unable to state how long he had the utility car assignment, how many times he had it during the relevant time period for *Alali II*, or even whether he had it more than five times from February through April 2007.  (*Id.*)  Likewise, though Plaintiff stated that he received other undesirable assignments (a double parking assignment and watching suicidal prisoners), (*id.* pp. 43–46), he was unable to specify when such assignments occurred or how many times during the relevant time period he got them (apart from "less than five" with respect to watching suicidal prisoners), and produced no other evidence on these subjects.  This stands in contrast to the February 21, 2007 hospital post and

---

[19]  In both the *Alali II* Complaint and his 56.1 Statement, Plaintiff alleges only that DeBara "informed Plaintiff that *prospectively* he (Plaintiff) would be primarily assigned to a 'utility car'. . . ."  (Pl.'s 56.1 p. 11 ¶ 55) (emphasis added); (Defs.' Ex. 9, ¶ 18(c).)

March 7, 2007 foot patrol, about which Plaintiff is quite specific.  Clearly Plaintiff did not routinely or regularly receive utility car assignments during those two months because if he did, he:  (a) would be able to say that he got it more than five times, (*see id.* pp. 44–45); and (b) would not single out the February 21, 2007 hospital post and the March 7, 2007 foot patrol as bad assignments within that period.  Because there is no evidence that Plaintiff was actually assigned to a "utility car" during the relevant time period, and because comments alone do not constitute an adverse employment action, DeBara is entitled to qualified immunity and summary judgment on these allegations.

As for the remaining allegation about the "bin Laden" comment, the parties dispute whether DeBara said this to Plaintiff.  (*Compare* Pl.'s Opp'n 28, *with* Defs.' *Alali II* Mem. 16.)  Such alleged verbal abuse (which, if it occurred, is wholly inappropriate) is insufficient to rise to the level of a materially adverse employment action because "[n]egative or otherwise insulting statements are hardly even actions, let alone 'adverse actions.'"  *Blake v. Potter*, No. 03-7733, 2007 WL 2815637, at *8 (S.D.N.Y. Sept. 25, 2007) (quoting *Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 280 (S.D.N.Y. 2004)); *see Payami v. City of N.Y.*, No. 03-2785, 2007 WL 945529 (S.D.N.Y. Mar. 28, 2007) (granting summary judgment where officer of Iranian descent allegedly called "terrorist" and "bin Laden"); *Teachout v. N.Y. City Dep't of Educ.*, No. 04-945, 2006 WL 452022, at *13 (S.D.N.Y. Feb. 22, 2006) ("Negative comments . . . are not, standing alone, adverse employment actions, because mere comments do not materially affect employment.").  DeBara is accordingly entitled to qualified immunity and summary judgment on these allegations as well.

26

d.      Captain Gazzola

Plaintiff contends that Gazzola told Plaintiff's supervisors to rate Plaintiff as below standards, though he cites no evidence in support; that because of the finding, Gazzola removed Plaintiff from overtime opportunities and from consideration for any specialized unit assignment; and that Plaintiff was not allowed special detail assignments or tour switches.  (Pl.'s Opp'n at 31.)  Plaintiff maintains that on March 8, 2007, Gazzola directed supervisors to give Plaintiff "bad" assignments because of his "below standards" rating, (*id.* at 30), and that after Gazzola was named as a defendant in *Alali I*, Gazzola concurred with the below standards rating given to Plaintiff on March 21, 2007, (*id.*).  Lastly, Plaintiff claims that Gazzola approved intentionally withholding tuition reimbursement from Plaintiff.  (*Id.* at 9.)

Defendants argue that Plaintiff has not produced admissible evidence that Gazzola directed Plaintiff's supervisors to give him low ratings and poor assignments.  (Defs.' Reply 12–13.)  They further contend that a negative employment evaluation does not constitute an adverse employment action for retaliation purposes where, as here, it does not alter the conditions of the plaintiff's employment.  (*Id.* at 13.)  Defendants also argue that even to the extent that Plaintiff makes out a *prima facie* case, Gazzola is still entitled to summary judgment because his decision to concur in Plaintiff's below standards rating was based on permissible, non-retaliatory factors—namely, Plaintiff's history of civilian complaints and command discipline problems—and Plaintiff has not shown that this was pretextual or otherwise false.  (*Id.* at 13–14.)

To start, Defendants are correct that Plaintiff's cited evidence does not include any information regarding his claims that Gazzola issued any directives to Plaintiff's supervisors on March 8, 2007.  (*See* Pl.'s 56.1 p. 12 ¶ 59 (citing Pl.'s Ex. 29 pp. 41–42, 137–38).)  Plaintiff's claim appears to relate to an alleged statement by Morrell and Austin to Plaintiff on an

27

unspecified day in April 2007 that he would be given undesirable assignments and issued a below-standards evaluation at Marshall's and Gazzola's direction, (*see id.* pp. 12–13 ¶ 61). Defendants argue that those statements are inadmissible hearsay, and are therefore "an insufficient basis for opposing a motion for summary judgment." *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005). The leg of the hearsay consisting of Gazzola's own statement is admissible against him as an admission of a party opponent, *see* Fed. R. Evid. 801(d)(2); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (finding that plaintiff's account of double-hearsay statements allegedly made by plaintiff's supervisors were admissible as admissions of party's agents), but to use this statement against Gazzola, Plaintiff would need another exception covering the other leg, *see* Fed. R. Evid. 805 (hearsay within hearsay admissible if each part falls within an exception), which has not been supplied. Plaintiff does not cite to any other evidence in support of his claim that Gazzola told Plaintiff's supervisors to rate him below standards. (*See* Pl.'s Opp'n 31.) Gazzola, whom Plaintiff did not depose, stated in an affidavit that he never directed Wilson to issue Plaintiff a below-standards rating for 2006.

In any event, the timing of the evaluation and Plaintiff's protected activities nullifies Plaintiff's argument. The relevant evaluation was signed by Wilson and Plaintiff on February 2, 2007, and by Gazzola on February 8, 2007, (Defs.' Ex. 53), while Plaintiff's EEOC charge is dated February 12, 2007, (Defs.' Ex. 1), and the *Alali I* complaint was filed on February 21, 2007, (Doc. 1), a timeline that contradicts Plaintiff's claim that Gazzola directed a bad evaluation of Plaintiff in retaliation for engaging in protected activity. Moreover, as the Court noted in its decision and order in *Alali I*, the below-standards ratings given to Plaintiff, including the 2006 evaluation at issue here, were reasonable determinations in light of the complaints and command discipline letters Plaintiff received during the relevant time periods. (Defs.' Ex. 7 p. 9.)

28

To the extent that Plaintiff's retaliation claim rests on Gazzola's March 21, 2007 memorandum concurring in Wilson's below-standards evaluation of Plaintiff, after Plaintiff "appealed" the evaluation and, along with Police Benevolent Association President Hayes, met with Gazzola, (Doc. 59 ¶¶ 32, 36–40; Defs.' Ex. 55; Pl.'s Ex. 6), and/or on the March 22, 2007 memorandum from Gazzola to Plaintiff stating that because of the below-standards rating, Plaintiff was to be barred from certain opportunities, (Defs.' Ex. 56), Plaintiff's argument is unavailing.  As noted, the below-standards ranking was reasonable given Plaintiff's disciplinary and complaint history during the relevant time period; Gazzola, moreover, did not originate the rating, but concurred with two other officers (Wilson and DeBara) in it (Defs.' Ex. 53); and after reviewing the evaluation, Gazzola made a correction favorable to Plaintiff, (Defs.' Ex. 55), which undermines any suggestion by Plaintiff that Gazzola was merely rubber-stamping the evaluation to harm Plaintiff.  Further, it is clear from the March 22, 2007 memorandum that the reduction in opportunities for Plaintiff was a consequence of his below-standards evaluation, not because Gazzola ordered them in retaliation, and was standard practice for the NRPD.  (Doc. 59 ¶ 42.)  Indeed, Defendants have produced undisputed evidence that the other officers with below-standards evaluations received letters identical to the one Plaintiff received.  (Defs.' 56.1 ¶¶ 156–57; Pl.'s 56.1 p. 61 ¶¶ 156–57.)

Finally, Plaintiff has put forward no evidence whatsoever that Gazzola was involved in the tuition reimbursement issue.

Thus Gazzola is entitled to qualified immunity and summary judgment on that basis.

e.  <u>Remaining Individual Defendants—Wilson, Austin, Marshall, Morrell, and Brady</u>

Plaintiff argues that the remaining individual Defendants—Wilson, Austin, Marshall, Morrell, and Brady—are not entitled to qualified immunity.  Plaintiff argues that each knew of

his protected activity because the NRPD is "not a large department"; talk of his EEOC charge and the *Alali I* lawsuit was "widespread"; and because Carroll, who was aware of the EEOC charge, "[p]resumably . . . would have advised Plaintiff's supervisor's [*sic*] (1) about the complaint and (2) not to engage in retaliation." (Pl's Opp'n 29.) Defendants, pointing to this Court's directive in the original motion for summary judgment, counter that even though each Defendant was deposed, Plaintiff still cannot point to any specific evidence that these Defendants were aware of Plaintiff's protected activity, and that summary judgment is accordingly merited. (Defs.' *Alali II* Mem. 17–18.)

In the first motion for summary judgment in this case, the Court specifically directed Plaintiff that in order to maintain his claims against these Defendants, evidence that each was "personally aware" of his protected activity was required, and that Plaintiff needed to "clarify the facts of the case as they relate to the elements of Plaintiff's claims against each of the Individual Defendants" through depositions, since "talk in the radio room" was insufficient to establish that each knew of the EEOC charge or *Alali I* complaint. (Doc. 51 pp.17–18, 21.) This Plaintiff has not done.[20]

Plaintiff has supplied no evidence that Wilson, Austin, Marshall, Morrell, and Brady knew of Plaintiff's protected activities. Plaintiff alleges that Wilson harshly rebuffed Plaintiff's query about the hospital post, and that Wilson assigned Plaintiff to work with civilian employees, telling him, "You are an Arab and its [*sic*] Easter. Camel jockeys don't celebrate Easter." (Pl.'s

---

[20]   The previous motion for summary judgment was denied pursuant to Fed. R. Civ. P. 56(f) so that Plaintiff could depose Defendants and others in an effort to obtain evidence establishing their knowledge, (Defs.' Ex. 15 pp. 17–21), but apparently Plaintiff did not even question those Defendants about their knowledge when he deposed them, (Defs.' 56.1 ¶ 38).

Opp'n 7, 9; Pl.'s 56.1 p. 13 ¶ 63.)[21]  As noted above, sporadic negative comments, without more, are not adverse employment actions, *see Saqib*, 2010 WL 2382253, at *1; *Teachout*, 2006 WL 452022, at *13, nor are occasional less-desirable assignments, *see*, *e.g.*, *Menes v. City Univ. of N.Y. Hunter Coll.*, 578 F. Supp. 2d 598, 615 (S.D.N.Y. 2008) (no adverse action where plaintiff did not demonstrate that he suffered any negative consequences from transfer); *Cahill v. O'Donnell*, 75 F. Supp. 2d 264, 274 (S.D.N.Y. 1999) (denial of request for lateral transfer not adverse), and Plaintiff has not presented any evidence connecting the allegedly adverse assignment to work with civilians to protected activity.  Plaintiff alleges that Morrell also callously rejected Plaintiff's inquiries into the reason for the foot patrol post on March 7, 2007, and, with Austin, informed Plaintiff on March 8, 2007 that he would receive "undesirable assignments" at Gazzola's and Morrell's direction because he was a "below standards officer." (Pl.'s Opp'n 7, 8.)  As previously discussed, the alleged comments are inactionable; Plaintiff's below-standards ranking was reasonable given Plaintiff's disciplinary and complaint history; and the resultant reduction in opportunities was standard practice for below-standards officers and not ordered specifically for Plaintiff as retaliation by his supervisors.  As to the allegedly adverse assignment by Austin on April 7, 2007 to work in the NRPD's radio room and rude comments by Austin and Brady regarding the assignment, again there is no indication this assignment was connected to Plaintiff's protected activities.  Finally, the only allegation against Marshall is that he and Gazzola directed that Plaintiff receive less desirable assignments because of his below-standards rating, which, as already detailed, was a standard consequence of the below-standards evaluation justifiably given to Plaintiff.

---

[21]  Nor has Plaintiff supplied evidence that they acted on the direction or with the encouragement of supervisors with such knowledge, but even if he had, that fact would suffice for the liability of the employer or such supervisors, but not for the liability of Wilson, Austin, Marshall, Morrell, and Brady.  See note 8 above (discussing *Henry*, 2010 WL 3023807, at **10–11).

Because of this failure to establish awareness of Plaintiff's protected activity on the parts of Wilson, Austin, Marshall, Morrell, and Brady, or that these Defendants' actions were in any way connected thereto, or, in many instances, that those actions rose to the level of adverse actions, these Defendants are entitled to qualified immunity and summary judgment.

f.    City of New Rochelle

Plaintiff charges New Rochelle with retaliation under Title VII, 42 U.S.C. §§ 1981 and 1983, and New York Executive Law § 296.  Citing *Kessler v. Westchester County Department of Social Services*, 461 F.3d 199 (2d Cir. 2006), and *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), he maintains that New Rochelle is not entitled to summary judgment on the Title VII claim because there are disputed material facts as to the allegedly retaliatory actions taken against him.  (Pl.'s Opp'n 32.)  Plaintiff also claims that New Rochelle is liable under Sections 1981 and 1983 (and presumably Section 296) because of the roles of Carroll, Murphy, and Gazzola in the "retaliatory actions and/or their failure to address Plaintiff's complaints of discrimination"; because Carroll, as Commissioner, is a policymaker, who exhibited deliberate indifference to retaliatory actions by subordinates; and because Plaintiff repeatedly informed Carroll, Murphy, Lt. James Fortunato, and Gazzola about discriminatory acts.  (*Id.* 33–34.)

Defendants maintain that New Rochelle is entitled to summary judgment because "the limited and isolated instances of alleged retaliatory conduct do not amount to adverse employment actions for purposes of a retaliation claim" under Title VII.  (Defs.' *Alali II* Mem. 20.)  They maintain that Plaintiff has not shown material adversity, as is required to sustain a Title VII retaliation claim, nor that a hostile work environment existed during the relevant time period.  (*Id.* at 20–21.)  Defendants additionally argue that New Rochelle is entitled to summary

judgment for claims under Sections 1981 and 1983 and Section 296 because liability cannot be

established under a theory of respondeat superior; Plaintiff has failed to establish a municipal

policy, practice, or custom of retaliation; and Plaintiff cannot point to "any facts demonstrating

[that] a policy-making official," including Carroll, personally participated in unlawful retaliation.

(*Id.* at 19.)

The anti-retaliation provision of Title VII "protects an individual not from all retaliation,

but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.  At the core of

any retaliation claim must be "[a]ffirmative efforts to punish a complaining employee." *Fincher*,

604 F.3d at 721 (citation omitted).  To establish a retaliation claim, "a plaintiff must show that a

reasonable employee would have found the challenged action *materially adverse*, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted and

emphasis added).  While this is an objective standard, "[c]ontext matters." *Id.* at 68, 69.

Because "there are no bright-line rules with respect to what constitutes an adverse employment

action for purposes of a retaliation claim," courts consider the challenged employment action on

a case-by-case basis to determine whether it rises to the level of "adverse." *Fincher*, 604 F.3d at

721.  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not

create" the level of deterrence required to make out an actionable retaliation claim. *Burlington*,

548 U.S. at 68.  "An employee's decision to report discriminatory behavior cannot immunize

that employee from those petty slights or minor annoyances that often take place at work and that

all employees experience." *Id.*

Whether or not a reassignment of job duties constitutes an adverse action "depends upon

the circumstances of the particular case, and should be judged from the perspective of a

reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation marks omitted).  "Common sense suggests that one good way to discourage an employee such as [plaintiff] from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id.* at 70–71.  In *Burlington*, the Supreme Court held that a jury could reasonably conclude that the plaintiff's reassignment of responsibilities, even when they did not involve a change in the job description, was materially adverse where the reassignment involved tasks that were "more arduous and dirtier," less prestigious, and objectively considered worse than the plaintiff's prior assignment by other employees. *Id.* at 71; *see Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 363 (S.D.N.Y. 2006) (more arduous assignment at less-desirable location could form basis for retaliation claim).  Likewise, the Second Circuit held that whether a transfer constituted an adverse action was a fact issue for the jury where the transfer resulted in the plaintiff losing supervisory authority and being forced to perform work "normally performed by clerical and lower-level personnel." *Kessler*, 461 F.3d at 209–10.  Courts are generally reluctant to find a materially adverse action "where a plaintiff is assigned work that is part of the employee's job," but such changes can satisfy the standard for a materially adverse action in certain situations. *Colapietro v. Dep't of Motor Vehicles*, No. 08-238, 2010 WL 2596519, at *9 (S.D.N.Y. June 24, 2010) (denying summary judgment where change in plaintiff's assignments caused increase in travel and transfer resulted in diminishment of plaintiff's duties even though she suffered no demotion in pay or title).  On the other hand, "[n]o reasonable employee would think being asked to perform tasks that are part of [his] job description constituted a materially adverse employment action." *Martin v. MTA Bridges & Tunnels*, 610 F. Supp. 2d 238, 254 (S.D.N.Y. 2009) (citing *Burlington*, 548 U.S. at 69).

34

Plaintiff argues that the various "bad" assignments he received—the hospital post on February 21, 2007; the foot patrol on March 7, 2007; the radio room assignment on April 7, 2007; and the assignment to work with civilian employees on April 8, 2007, (Pl.'s 56.1 pp. 10, 11, 13 ¶¶ 53, 56, 62, 63), and those he was told he would receive going forward[22]—were adverse and therefore qualify as retaliatory actions.  Defendants do not deny that these assignments were ordinarily given to junior or probationary officers, (*see* Defs.' Resp. 56.1 ¶¶ 53, 54–56, 58, 62, 63), but neither does Plaintiff deny that they were assignments within the realm of possible assignments for his position in the NRPD; rather, he maintains they were ones he ought not to have received, (*see*, *e.g.*, Pl.'s Ex. 29 pp. 43–44, 48–49, 55, 58, 64, 124–26).  Furthermore, Plaintiff did not actually complete the foot patrol on March 7, 2007; after questioning his supervisors as to why he received that assignment, and being told that he could use a car instead of going on foot after all, he went home sick before beginning his tour of duty.  (Pl.'s Ex. 29 pp. 49–50 *ll.* 16–25, 2–5; p. 51 *ll.* 11–23; p. 52 *ll.* 5–22; p. 54 *ll.* 13–23; pp. 55–65 *ll.* 11–16.)

In sum, Plaintiff points to four instances of "bad" assignments (at least one of which was rescinded) over a six-week period.  These limited instances, involving no change in title, pay, or general responsibilities, and being temporary in nature, are not the kind of employment actions that could be considered reasonably likely to deter a person from engaging in protected activity. Rather, they are the sorts of "trivial harms," "minor annoyances," or inconveniences that the Supreme Court specifically distinguished from material adverse actions.  *Burlington*, 548 U.S. at 68; *see Szarzynski v. Roche Labs., Inc.*, No. 07-6008, 2010 WL 811445, at *13 (W.D.N.Y. Mar. 1, 2010) ("[I]n order to qualify as materially adverse a change in working conditions must be

---

[22]  Plaintiff also claims that he was told by DeBara some time after February 21, 2007 that he would be assigned to a "utility car," a post "usually reserved for probationary and/or junior officers," (Pl.'s Opp'n 22), but, as discussed above, *see* pp. 25–26, there is an absence of evidence that he in fact received such an assignment.

more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal

quotation marks omitted); *see also Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07-8676,

2010 WL 184450, at *12 (S.D.N.Y. Jan. 20, 2010) (where it was plaintiff's ordinary job to

manage claims files, receipt of bulk file transfers not adverse employment action); *Gelin v.

Geithner*, No. 06-10176, 2009 WL 804144, at *21 (S.D.N.Y. Mar. 26, 2009) (brief assignments

that plaintiff previously worked on and receipt of more complex assignments, which plaintiff

could return if unable to handle, not materially adverse); *Hinton v. City Coll. of N.Y.*, No. 05-

8951, 2008 WL 591802, at *27 (S.D.N.Y. Feb. 29, 2008) (college professor dissatisfied with

teaching assignments did not suffer adverse employment action); *Gamble v. Chertoff*, No. 04-

9410, 2006 WL 3794290, at *8 (S.D.N.Y. Dec. 27, 2006) (instruction to switch cubicles had

only "trivial effect" and "jury could not reasonably conclude that [it] . . . would have dissuaded a

reasonable employee from pursuing her discrimination claims").[23]

 The alleged comments also fall into the category of callous, but not sufficiently adverse

because, as the Supreme Court has said, "Title VII . . . does not set forth a 'general civility code

for the American workplace.'" *Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner

Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *cf. Faragher v. Boca Raton*, 524 U.S. 775, 788

(1998) (judicial standards for sexual harassment must "filter out complaints attacking the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

related jokes, and occasional teasing") (internal quotation marks omitted).

 Finally, although the "reasonable person" standard in assessing materiality is an objective

one, *Burlington*, 548 U.S. at 68, and an individual plaintiff need not actually be dissuaded from

making a charge of discrimination, *Sebold v. City of Middletown*, No. 05-1205, 2007 WL

---

[23]  Moreover, given Plaintiff's record of civilian complaints, assignments that kept him off the street on occasion do not strike the Court as unreasonable.

2782527, at *21 (D. Conn. Sept. 21, 2007), I also note that Plaintiff regularly engaged in

protected activity and made many complaints of his treatment throughout this period.[24] *See*

*Babcock v. N.Y. State Office of Mental Health*, No. 04-2261, 2009 WL 1598796, at *20

(S.D.N.Y. June 8, 2009) (fact that plaintiff responded to allegedly adverse action by filing

grievances "suggests that . . . staffing decisions did not 'dissuade [Plaintiff] from making or

supporting a charge of discrimination.'") (quoting *Burlington*, 548 U.S. at 68).

 I find that Plaintiff has not established that he suffered a materially adverse employment

action, and summary judgment is warranted as to his Title VII claim against New Rochelle.  Had

he been permanently reassigned to lesser duties during the applicable time frame, the result

might be different, but four (or actually three) unglamorous assignments over a two-month

period amounts to, at most, petty slights.  *See Babcock*, 2009 WL 1598796, at *20 (changes to

ward assignment on overtime shifts nothing more than petty slight or minor annoyance generally

not actionable in retaliation context).[25]

 As to Plaintiff's Section 1981 and 1983 claims, Plaintiff has not shown municipal policy,

custom, or practice as required to sustain such a claim.  *See Webster v. City of N.Y.*, 333 F. Supp.

2d 184, 207 (S.D.N.Y. 2004) (granting summary judgment where "[t]he record . . . is barren of

specific evidence demonstrating the existence of a municipal policy or custom such as would

satisfy Plaintiffs' burden").  While the actions of a "policy maker" may be sufficient to impose

---

[24]  Plaintiff spoke with his supervisors and notified the internal affairs officer regarding the hospital post and other assignments he received, (Pl.'s Ex. 29 p. 34 *ll.* 19–24; pp. 40–41 *ll.* 12–25, 2–21; p. 63 *ll.* 7–15; p. 64 *ll.* 7–21; p. 72 *ll.* 17–25; p. 73 *ll.* 22–24; p. 74 *ll.* 14–22); "memorialized in writing to" the internal affairs officer and "possibly Carroll" other instances where he felt he received bad or unfair assignments, (*id.* pp. 58–59 *ll.* 24–25, 2–6); and generated an "intradepartmental communication basically stating that [the bad assignments were] obviously egregious and unfair, and [Plaintiff was] being punished again solely based on [his] heritage," (*id.* pp. 60–61 *ll.* 17–25, 2–16).

[25]  While the absence of adverse action is discussed in connection with New Rochelle's liability, it also provides an alternative ground for dismissal of the retaliation claims against the individual Defendants.

37

liability on a municipality, *see McWhite v. N.Y. City Hous. Auth.*, No. 05-0991, 2008 WL
1699446, at *17 (E.D.N.Y. Apr. 10, 2008) (quoting *Okla. City v. Tuttle*, 471 U.S. 808, 824–25
(1985)), Plaintiff has produced no evidence that Carroll, whom he has identified as a
policymaker, was involved in any constitutional deprivations during the relevant time period.
Plaintiff's allegations regarding Carroll's role in tuition reimbursement and his unspecified "role
in retaliatory actions" are insufficient to survive a motion for summary judgment.  I therefore
find that summary judgment for the City is warranted for the 42 U.S.C. §§ 1981 and 1983, and
Section 296 claims.

###           2.       *Alali III*

As noted above, *Alali III* concerns the period following the filing of *Alali II* through the
filing of the *Alali III* complaint (April 11, 2007 through November 9, 2007).  Plaintiff alleges
that he was generally mistreated and twice subjected to suspensions without pay in connection
with the preferral of disciplinary charges that he claims Carroll admitted to be retaliation for
Plaintiff's filing of *Alali I* and *Alali II*.  (Case No. 07-cv-9912, Doc. 1 ¶¶ 6(a–j, k); Pl.'s 56.1 p.
17 ¶ 77.)  (Plaintiff does not explain how Carroll admitted to retaliation or provide any evidence
that Carroll in fact made any such admission.)  Plaintiff further contends that he was permanently
assigned to work as a *de facto* civilian in the role of dispatcher.  (Case No. 07-cv-9912, Doc. 1 ¶
6(*l*); Pl.'s 56.1 p. 17 ¶ 78.)

Defendants argue that summary judgment is warranted because (1) most of the claims
alleged by Plaintiff are barred by collateral estoppel; (2) the remaining retaliation claims fail
because too much time elapsed between the protected activities and the challenged employment
actions to establish causation; and (3) even if an inference of causation can be found, Defendant
New Rochelle had valid, non-retaliatory reasons for the employment actions.  (Defs.' *Alali III*

Mem. 4, 7–9.[26])  Plaintiff concedes that most of the allegations are barred by collateral estoppel but maintains they are included for background purposes only.  (Pl.'s Opp'n 35; Pl.'s 56.1 p. 34 ¶ 47.)  He clarifies that the sole claim in *Alali III* is the Title VII claim against New Rochelle. (Pl.'s Opp'n 34.)

To start, Defendants are correct that many of the instances claimed by Plaintiff as retaliation are barred by collateral estoppel because they were previously decided in *Alali I*. Summary judgment is therefore granted on all claims contained in paragraph 6, subsections (a) through (j), of the *Alali III* Complaint.

Most of the remaining allegations discussed in Plaintiff's Opposition were not included in the *Alali III* Complaint.  Contrary to Plaintiff's argument, the inclusion of these additional claims in an opposition to a motion for summary judgment is distinguishable from the situation addressed in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002), which held that in an employment discrimination case a plaintiff need only supply a "short and plain statement of the claim showing that the pleader is entitled to relief."  That case concerns pleading standards under Fed. R. Civ. P. 8(a), and does not address summary judgment as to claims wholly absent from the complaint, as is the situation here.

A party may not raise new claims or theories of liability for the first time in opposition to summary judgment, a point that has already been made to Plaintiff in this case.  (Doc. 51 p. 8 n.6 ("[I]t is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment.") (citing cases).)  *See Casseus v. Verizon N.Y., Inc.*, No. 08-4119, 2010 WL 2736935, at *14 (E.D.N.Y. July 9, 2010) ("[C]ourts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment."); *Bush v.*

---

[26]  "Defs.' *Alali III* Mem." refers to Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  (Doc. 63.)

*Fordham Univ.*, 452 F. Supp. 2d 394, 406 (S.D.N.Y. 2006) (refusing to consider specific instance of discrimination that was first alleged in opposition to motion for summary judgment but not made in complaint or EEOC charge); *Heletsi v. Lufthansa German Airlines, Inc.*, No. 99-4793, 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001) ("A party cannot amend their [*sic*] complaint simply by alleging new facts and theories in their memoranda opposing summary judgment."); *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense.") (citation omitted).  Such a maneuver is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a motion.  Accordingly, Plaintiff's assertions, raised for the first time in opposition to summary judgment, that New Rochelle retaliated against him as evidenced by (1) failing to provide police backup on April 20, 2007; (2) "Morrell['s] misconduct and theft of Plaintiff's property," as detailed by Plaintiff in a May 20, 2007 memorandum; (3) a "biased performance evaluation based on [Plaintiff's] heritage," reported by Plaintiff in a June 21, 2007 memorandum; (4) Morrell allegedly ordering Plaintiff to put on his uniform hat at roll call on June 23, 2007; (5) Gazzola's unspecified alleged discrimination as detailed by Plaintiff in a July 12, 2007 memorandum; and (6) retaliation to which Plaintiff was allegedly subjected and which he reported in a memorandum on August 31, 2007, (Pl.'s Opp'n 35–37), are improperly raised and cannot defeat summary judgment.[27]

      While Plaintiff raises these new theories of liability in his Opposition, he neglects to address the claims that actually do remain in the *Alali III* Complaint:  that he was twice subjected

---

[27]  The memoranda are unauthenticated and contain hearsay, so unless the events described therein were supported by credible evidence, there would be no evidence of these events in the record in any event.  See note 11 above.

to suspensions without pay in connection with the preferment of disciplinary charges and that he

was permanently assigned to work as a *de facto* civilian in the role of dispatcher.  (Case No. 07-

cv-9912, Doc. 1 ¶ 6(k, *l*).)  Because Plaintiff's Opposition does not address Defendants' Motion

for Summary Judgment on these claims, they are deemed abandoned, and summary judgment is

granted on that basis alone.  *See Marache v. Akzo Nobel Coatings, Inc.*, No. 08-11049, 2010 WL

908467, at *15 (S.D.N.Y. Mar 12, 2010) (claim abandoned by virtue of plaintiff's failure to

address it in opposition to defendant's summary judgment motion; citing cases); *Arias v.

Nasdaq/Amex Mkt. Grp.*, No. 00-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003)

(dismissing claims as "abandoned" where plaintiff's opposition  "neither refute[d] nor even

mention[ed]" defendant's argument for summary judgment); *see also* Local  Civ. R. 7.1(a)

("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points

and authorities relied upon . . . in opposition to the motion . . . .  Willful failure to comply with

this rule may be deemed sufficient cause for the . . . granting of a motion by default.")

      In an excess of caution, however, I have also considered the substance of Plaintiff's claim

for those two allegations, and find them to be without merit.  It is not disputed that Plaintiff's

thirty-day May 2008 suspension was imposed more than one year after the filings of *Alali I* on

February 21, 2007, and *Alali II* on April 11, 2007, and was based on conduct that occurred in

2006.  (*See* Pl.'s 56.1 p. 48 ¶ 104; pp. 50–51 ¶¶ 109–15; p. 53 ¶ 125.[28])  Similarly, the second set

of disciplinary charges were preferred on September 11, 2007, concerned conduct during May,

---

[28]  Plaintiff denies Defendants' statement that Carroll adopted the penalty recommendations regarding this first set
of disciplinary charges and formally suspended Plaintiff without pay for thirty days.  (Pl.'s 56.1 p. 53 ¶ 125.)
Because Plaintiff does not provide any explanation for this in his response to Defendants' 56.1 Statement, address
this in his Opposition to the Motion for Summary Judgment, or submit evidence countering this statement, and
because Plaintiff's claims in *Alali IV* are based, in part, on the May 2008 thirty-day suspension arising from
disciplinary charges brought in February 2007, (*see* Case No. 08-cv-4273, Doc. 1 ¶ 5), I accept as true that these
disciplinary charges resulted in Plaintiff receiving a thirty-day suspension in May 2008.

July, and August 2007, and resulted in a thirty-day suspension for Plaintiff commencing August 31, 2007.  (*See* Defs.' 56.1 ¶¶ 118–20, 122; Pl.'s 56.1 pp. 52–53 ¶¶ 118–20, 122.)  This was six months after the filing of *Alali I* and four months after the filing of *Alali II*.  "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  *Cifra*, 252 F.3d at 217 (internal quotation marks omitted).  Here, the bases for retaliation allegedly occurred over a year before Plaintiff's suspension in May 2008, and several months before his August 2007 suspension, lapses of time that are too great to support an inference of discrimination.  *See*, *e.g.*, *Walder v. White Plains Bd. of Educ.*, No. 07-235, 2010 WL 3724464, at *14 (S.D.N.Y. Sept. 24, 2010) ("Most of the decisions in this Circuit that have addressed [temporal proximity] have held that lapses of time shorter than even three months are insufficient to support an inference of causation") (collecting cases); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 82, 85–86 (2d Cir. 1990)  ("lack of evidence demonstrating a causal nexus between [Plaintiff's] age discrimination complaint and any subsequent action taken towards him" precluded his claim where the only evidence of causation was a three-and-a-half-month lapse between complaint and adverse action).  Moreover, the progress of discipline over time, according to an internal NRPD schedule, with hearings held in both instances, further preclude any inference of discrimination or retaliation that might arise from the timing of the suspensions.  (*See* Defs.' 56.1 ¶¶ 117, 124.) "Adverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation sufficient to make out a *prima facie* case."  *Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).  Furthermore, the discipline—two thirty-day suspensions, one for reckless driving, leaving his

designated area of patrol on numerous occasions, and failing to properly maintain his memo book, (Defs.' 56.1 ¶¶ 113, 115), and one for failing to properly maintain his memo book and make required entries, leaving his designated area of patrol, failing to promptly and properly answer the police radio while on duty, and failing to remain at home while out on sick leave, (Defs.' Ex. 45)—was reasonable given Plaintiff's extensive record of civilian complaints and long history of receiving command discipline letters, (*see* Defs.' 56.1 ¶¶ 55–82, 86–87, 93–103), the existence of which Plaintiff does not deny, (*see* Pl.'s 56.1 pp. 35–42 ¶¶ 55–82; p. 43 ¶¶ 86–87; pp. 45–48 ¶¶ 93–103).  Thus, Defendants' evidence of legitimate, non-discriminatory reasons for these suspensions has not been rebutted.  Plaintiff has not argued or submitted any evidence that his suspensions were pretextual, and to the extent that Plaintiff relies on the improper anti-Middle Eastern comments, he has not established that the outcome of his disciplinary hearings was determined by the makers of such comments.

As for Plaintiff's alleged assignment to the radio room, which he claims renders him a *de facto* civilian, Plaintiff has provided no evidence regarding this allegation.  It is unaddressed in his Opposition to the Motion for Summary Judgment, and its sole mention in Plaintiff's 56.1 Statement provides no evidentiary support apart from the *Alali III* Complaint itself.  Such an unsupported claim cannot survive a motion for summary judgment.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *see also* Fed. R. Civ. P. 56(f) (party opposing summary judgment cannot rely on pleading and must set forth, by affirmation or otherwise, specific facts showing genuine issue for trial).

For these reasons I find that summary judgment is warranted.

### 3.     *Alali IV*

In *Alali IV*, Plaintiff brings two causes of action, alleging that he was subjected to disparate treatment because of his national origin and in retaliation for opposing discrimination in the workplace.[29]  He claims that he suffered disparate treatment because of his two suspensions without pay, which he maintains were motivated in whole or in substantial respect because of his national origin, assertion of his rights under Title VII, opposition to race-based workplace discrimination, and/or "whistle-blowing" on department corruption.  In support, Plaintiff argues that he commenced protected activity in November 2006, and only thereafter were disciplinary charges brought against him.  (Pl.'s Opp'n 38–39.)  He also points to testimony by PBA Union President Edward Hayes that Plaintiff was treated differently.  (*Id.* 40–41.)   Most importantly, Plaintiff describes various acts of misconduct allegedly committed by other NRPD officers and civilian employees that resulted in either no disciplinary action or punishments less severe than his own.  (Case No. 08-cv-4273, Doc. 1 ¶ 6; Pl.'s 56.1 pp. 19–24 ¶¶ 89–114.)

Defendants argue that New Rochelle is entitled to summary judgment on *Alali IV*'s disparate treatment claims because Plaintiff has failed to establish that he is similarly situated to the alleged comparator officers whom he claims received better treatment and because New Rochelle had valid, non-retaliatory reasons for the employment actions taken.  (Defs.' Reply 22–25.)

Disparate treatment claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework.  *Billue v. Praxair, Inc.*, No. 07-2359, 2008 WL 4950991, at *1 (2d Cir. Nov. 20, 2008).  "Disparate treatment claims require proof of an employer's discriminatory motive, which 'can in some situations be inferred from the mere fact of differences in treatment.'" *United States v. City of N.Y.*, No. 07-2083, 2010 WL 1948562, at *12 (S.D.N.Y. May 13, 2010)

---

[29]  Plaintiff has withdrawn his First Amendment chilling claim.  (Pl.'s Opp'n 37 n.5.)

(quoting *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977)).  To establish a *prima facie* case of disparate treatment, Plaintiff must demonstrate:  (1) that he is part of a protected class; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding that employment action give rise to an inference of discrimination.  *Abdu-Brisson*, 239 F.3d at 466.  "A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case."  *Ruiz v. Cnty. of Rockland*, No. 09-0759, 2010 WL 2541179, at *5 (2d Cir. June 25, 2010) (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  A plaintiff relying on disparate treatment evidence to demonstrate the inference of discrimination must show that the individuals to whom he attempts to compare himself are "similarly situated in all material respects."  *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  An employee is "similarly situated" to other employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct."  *Id.* at 40.  "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  *Id.*  That is, the comparators must be similarly situated to the plaintiff "in all material respects."  *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

It is not disputed that Plaintiff satisfies the first three prongs of the *prima facie* test:  he is a member of a protected class; he was qualified for his position; and he suffered an adverse employment action when he received the two thirty-day suspensions.  He has not, however, satisfied his burden on the fourth prong.  Plaintiff does not address Defendants' argument that

45

the employees he proposes as comparators lack the disciplinary history of Plaintiff, and are therefore not similarly situated to Plaintiff in all material respects.  This omission is fatal to his claims, since it is clear that Plaintiff's significant disciplinary history is material to the discipline he received for various infractions.  *See Dinkins v. Suffolk Transp. Serv., Inc.*, No. 07-3567, 2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010) (plaintiff failed to show other employees similarly situated when they lacked plaintiff's disciplinary record); *Saenger v. Montefiore Med. Ctr.*, No. 07-488, 2010 WL 1529400, at *15 (S.D.N.Y. Mar. 31, 2010) ("[The comparator employee] was also materially different from Plaintiff because she did not have an extensive disciplinary history, and had not been repeatedly warned that additional misconduct could result in termination."); *McKinney v. Bennett*, No. 06-13486, 2009 WL 2981922, at *7 (S.D.N.Y. Sept. 16, 2009) (plaintiff not similarly situated to comparator employees because, among other things, he "has not shown these people to have a comparable disciplinary history to his own or to have any disciplinary history at all").  Hayes's statement that Plaintiff was treated differently—which, in any event, is inadmissible lay opinion, *see* Fed. R. Evid. 701; *see also Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("[I]n an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision . . . . [S]peculative lay opinion that [differential treatment] is attributable to race rather than anything else, is not helpful . . . because it merely tell[s] the jury what result to reach.") (internal quotation marks omitted and final alteration in original)—does not evidence that any difference in treatment was not justified, and given Plaintiff's well documented and lengthy disciplinary history, treating him differently than an average officer would be appropriate.

I find that Plaintiff has not shown that he was similarly situated to the other NRPD officers and employees. Because Plaintiff has not established a *prima facie* case of disparate treatment, summary judgment is granted. Furthermore, even if Plaintiff had established a *prima facie* case, Plaintiff's suspensions, as discussed above, were the culmination of a lengthy process and were imposed for legitimate reasons, and Plaintiff has not supplied evidence that the stated reasons were pretextual. Finally, as noted, he has not established that the outcome of his disciplinary hearing was determined by the makers of the improper comments.

## III.   CONCLUSION

For the foregoing reasons, summary judgment is granted to Defendants in *Alali II*, 07-cv-2916; *Alali III*, 07-cv-9912; and *Alali IV*, 08-cv-4273. The Clerk of the Court is respectfully directed to terminate the pending motions, (Doc. 55 in *Alali v. DeBara*, 07-cv-2916), and close that case, *Alali v. City of New Rochelle*, 07-cv-9912, and *Alali v. City of New Rochelle*, 08-cv-4273. This Memorandum Decision and Order is to be docketed in 07-cv-2916, 07-cv-9912, and 08-cv-4273.

**SO ORDERED.**

Dated: September 30, 2010
White Plains, New York

CATHY SEIBEL, U.S.D.J.